IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JOSEPH G. GORSICH,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 09-355-JPG-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Joseph G. Gorsich seeks judicial review of the final agency decision finding that he is not disabled and denying him Supplemental Security Income Benefits (SSI) pursuant to **42 U.S.C. § 423**.[1]

## Procedural History

Plaintiff filed an application for SSI on May 13, 2005, alleging disability beginning on July 17, 2001. (Tr. 67). He claims disability due to ruptured discs, neck and shoulder problems, and carpal tunnel syndrome. (Tr. 94).

After the application was initially denied, a hearing was held before Administrative Law Judge (ALJ) Francis J. Eyerman on July 2, 2007. (Tr. 397-442). ALJ Eyerman denied the application for benefits in a decision dated September 27, 2007. (Tr. 20-30). The Appeals

---

[1]The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

Council denied review, and this decision became the final agency decision.  (Tr. 4).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff filed a Motion for Summary Judgment (**Doc. 15**), in which he argues that the ALJ's decision denying him benefits was not supported by substantial evidence in that:

1. The hypothetical questions posed to the VE did not include a limitation that the ALJ found as part of his determination of plaintiff's RFC, i.e., that plaintiff has moderate limitation in his ability to carry out detailed instructions.

2. The ALJ failed to give proper weight to the opinions of Dr. Vest.

3. The ALJ erred in failing to include limitations in the ability to perform manipulative tasks in his RFC determination.

4. The ALJ erred in assessing plaintiff's credibility.

5. The ALJ erred in rejecting the opinion of Dr. Broneck as to plaintiff's mental impairments.

Defendant filed a response in opposition at **Doc. 18**.

## The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation.  The following is a summary of some of the pertinent portions of the written record.

The relevant evidentiary hearing was held before ALJ Eyerman on July 2, 2007.  (Tr. 397-442).  The record also contains a transcript from an earlier hearing, held on December 1, 2004, which related to a prior application for benefits.  (Tr. 382-306).  That application was denied in January, 2005.  (Tr. 40).  Mr. Gorsich did not appeal from the denial of his earlier application, Tr. 71, and the previous denial is not at issue here.

1.      **Plaintiff's Testimony**

Plaintiff was represented at the hearing by attorney Martin Carrow, II.  (Tr. 397).

Joseph Gorsich was born on April 1, 1959.  (Tr. 401).  He graduated from high school after having taken special education classes.  The special education classes related to a reading disability.  He has had no further vocational or technical training.  (Tr. 401-402).

He is 6 feet and 1 inch tall, and weighs from 260 to 280 pounds.  (Tr. 403).  He is divorced, with no minor children.  At the time of the hearing, he was living with his two brothers in a house that had belonged to their parents.  (Tr. 404).

Plaintiff's past work was as a carpenter or construction laborer.  (Tr. 404).  He last worked about 2 years prior to the hearing, for a framing company.  He was unable to do the work, and "was back in the emergency room because of the same problems I've always had." (Tr. 404).

Mr. Gorsich testified that he "blew out" two discs in his low back in 1989, and had surgery.  He was also treated for severe neck pain.  Since then, he has been to "about nine doctors," but still has pain.  He stated that he "cannot even get my arms to my chest without severe pain in the neck."  He also has had a "knot" in his arm since 2001.  (Tr. 402).

When asked when he became disabled, plaintiff testified that he became disabled in 1989 because his back "does not work."  (Tr. 430).  The ALJ asked him how his condition has changed since January, 2005, when his last application for disability benefits was denied.  He testified that he is worse in that his "right arm has a knot" and "doesn't work."  (Tr. 411).  Plaintiff acknowledged that the knot has been present since 2001, but stated that it is worse.  He then stated that "The knot's in my shoulder."  (Tr. 412).  He also testified that he is worse in that his neck "swells up" and "doesn't go down."  He added that "the same pain before the knot showed up is now in my left arm."  (Tr. 412).

Dr. Vest is his most recent doctor.  He saw him about a year prior to the hearing.  (Tr.

405).  He was also seen in the emergency room at Gateway Regional Hospital on March 31, 2007, for pain in the neck, right shoulder, upper and lower back caused by raking in the yard. (Tr. 415).

Plaintiff has no medial insurance or public aid insurance card.  (Tr. 405).  He testified that his ability to get medical treatment is limited because he has no money or insurance.  (Tr. 422).

He was not on any medication at all at the time of the hearing.  (Tr. 421).

Mr. Gorsich testified that he can stand for a couple of hours, but has pain.  He can sit for an hour or so.  He puts ice and heat on his back but it does not help anymore..  (Tr. 421).  He would not be able to do work consisting of sitting and assembling items because of the knots in his shoulder and neck.  (Tr. 427).

Plaintiff testified that his pain is worse than a 10 on a scale of 1 to 10 at the end of the day if he has been "doing anything."  He stated that "I'm tired of pushing it.  I can't push it no more."  (Tr. 428).  He stated that he is in "constant pain" and that changing positions does not help.  (Tr. 407).

Regarding daily activities, plaintiff testified that he washed his own dishes.  He does not walk much because it inflames his neck and shoulder.  Also, he has been told that he has pulled the muscle away from his left knee.  Bending and stooping cause his knees to pop out of place. His brothers handle most of the household chores.  He sometimes shops for groceries, with help. (Tr. 407- 409).  He later testified that he does his share in that they take turns mopping floors and sweeping.  He has not tried to vacuum since the emergency room visit in March, 2007.  (Tr. 414).  He cooks for himself.  (Tr. 420).  He changes his bed sheets.  (Tr. 426).  He does not bend and scrub anything.  (Tr. 426).  He has no trouble feeding or dressing himself.  (Tr. 428).  He has some difficulty bathing because of limitation of his ability to move his arms.  (Tr. 428).  He is able to tie his shoes.  (Tr. 429).  Plaintiff estimated that he can only lift 5 pounds.  (Tr. 429).

The Department of Vocational Rehabilitation sent him for an evaluation by a psychologist.  He has had no other treatment for mental health issues.  He testified that he is depressed because of his pain and knowing how he hurts.  (Tr. 410).

**2.**     **Testimony of Vocational Expert**

Vocational Expert John Dolan testified at the hearing.  Plaintiff had no objections to his qualifications.  (Tr. 431).

Plaintiff's past work as a building and house repairer was heavy and skilled.  His skills would not transfer to a job below the medium exertional level.  (Tr. 434).

ALJ Eyerman asked Mr. Dolan to assume a physical RFC of ability to lift 25 pounds frequently and 50 pounds occasionally, sit for 6 hours out of 8, stand and/or walk for 6 hours out of 8, with no other exertional or postural limitations.  He also added to the hypothetical mental RFC of moderate limitations in the ability to maintain attention and concentration, ability to complete a normal workweek, ability to interact with the general public and ability to respond to changes in the work setting.  The hypothetical question also assumed no limitations in the ability to carry out detailed instructions.  (Tr. 435-436).  The VE testified that a person with this RFC would not be able to do plaintiff's previous work.  (Tr. 436).

The ALJ then changed the hypothetical to assume that the person would not have to  sit or stand more than two hours at a time, and could lift 10 pounds frequently and 20 pounds occasionally, with all other limitations being the same.  The VE testified that a person with that RFC could perform the jobs of cashier (2,000 jobs), food and beverage order clerk (700 jobs), and unskilled security guard (3,000 jobs).  The VE testified that he could do these jobs on a full-time basis.  (Tr. 437-438).  He also testified that these jobs differ from the descriptions in the *Dictionary of Occupational Titles* in that he was accounting for the sit/stand option, and that, in the real world, some security guard jobs are performed at the unskilled level, which is the number that he testified to.  (Tr. 438).

The ALJ posed another hypothetical which assumed the limitations listed by Dr. Vest on the form which he filled out. The VE testified that those limitations would preclude work. (Tr. 438-439). Lastly, the ALJ posed a hypothetical which assumed the limitations listed by Dr. Vest in his narrative report, i.e., lifting no more than 10 to 15 pounds, with no prolonged standing, walking, bending, or stooping, and no repetitive use of the hands. The VE testified that the jobs he had identified are all unskilled, and that unskilled work requires repetitive use of the hands. (Tr. 439). The VE then testified that it is unclear what Dr. Vest meant by the term "repetitive" and suggested that he might have actually meant "constant." The VE testified that the ability to mop a floor requires the ability to use the hands repetitively. If he could use his hands repetitively, but not constantly, he could perform the jobs testified to earlier. (Tr. 439-440).

**3.**     **Medical Evidence Prior to the Relevant Period**

Mr. Gorsich's prior application was denied in January, 2005. That decision is res judicata and stands as a finding that he was not disabled as of January, 2005. Thus, while the Court may consider medical evidence which predates January, 2005, it must accept the Commissioner's decision that Mr. Gorsich was not disabled as of that time. **See, *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998).**

In July, 1988, plaintiff injured his back at work. He was diagnosed with small central herniated discs at L4-5 and L5-S1. Dr. David Wilkinson performed a lumbar laminectomy with microdiscectomy on August 2, 1989. (Tr. 196).

Mr. Gorsich was treated by Dr. Thomas Tse in 1988 for neck pain and spasm. He was treated with physical therapy. X-rays and CT-scan of his cervical spine were essentially normal. (Tr. 171-175).

Mr. Gorsich returned to Dr. Wilkinson in May, 2002, stating that he had back, neck and shoulder pain. He was pursuing a workers compensation claim, but was unable to identify any specific work injury. (Tr. 201). Cervical and lumbar myelograms were done, and Dr. Wilkinson

concluded that Mr. Gorsich had degenerative changes, but no ruptured discs.  He stated that "findings are unchanged in the last ten years."  (Tr. 269).

Dr. McKee treated plaintiff for an injury to his finger in July, 2001.  (Tr. 232, 241). In June, 2002, plaintiff began complaining of pain and numbness in his hands, worse on the left. (Tr. 233).  Nerve conduction studies showed mild carpal tunnel syndrome on the right.  (Tr. 234). In September, 2002, Dr. McKee noted that Dr. Dusek had diagnosed a lipoma in the right shoulder.  (Tr. 236).  In January, 2003, Dr. McKee noted that his complaints were not consistent with the results of testing, and noted that he was depressed and suggested psychological treatment. (Tr. 237).

From January to March, 2003, plaintiff was treated by a chiropractor for pain in his neck, low back, both arms and both legs.  X-rays taken in January, 2003, showed degenerative changes in the lumbar and cervical spine, and "cystic degenerative changes" in the right shoulder joint. (Tr. 261).  The discharge note states that he still complained of pain after 4 weeks of treatment. The motor, sensory and reflex exams were "grossly normal."  He had full cervical range of motion without pain, 30 degrees of extension with lower back pain, and could bend to either side without difficulty.  (Tr. 254-272).

**4.    Medical Evidence within the Relevant Period**

There are relatively few records of medical treatment within the relevant period.

**a)    Work Capacity Evaluation, May 12, 2005**

A Work Capacity Evaluation was performed at Gateway Regional Medical Center on May 12, 2005.  (Tr. 101-136).  The evaluator observed that "Mr. Gorsich demonstrated sub-maximal levels of physical effort throughout testing and considerable question should be drawn as to the reliability of his subjective reports."  (Tr. 103).  The evaluator suggested that he could do work at the sedentary to light level.

**b)**     **Examination by Dr. Chapa, June 30, 2005**

On June 30, 2005, Dr. Vital Chapa examined Mr. Gorsich on a referral from the state agency.  His report is at Tr. 290-293.  Dr. Chapa noted that he was alert and oriented, and in good contact with reality.  His cranial nerves were within normal limits.  He hd no motor weakness or muscle atrophy.  There was no paravertebral muscle spasm.  His grip strength was good in both hands, and he could perform gross and fine manipulations with both hands.  He was able to flex his lumbar spine to 70 degrees, and had a full range of motion of the hips and knees. He had no difficulty walking.  His sensory examination was normal.  Dr. Chapa noted no evidence of cervical radiculopathy.  Straight leg raising was negative, and he had a negative Tinel's sign at both wrists.

**c)**     **Examination by Dr. Vest, July 13,  2005**

Although Dr. Vest is referred to as plaintiff's treating doctor, there are no records of treatment in the file.  The only visit reflected in the record is a disability examination performed by Dr. Vest on July 13, 2005.  The report is at Tr. 309-311.  Mr. Gorsich gave a history of low back pain which prevented him from working, along with chronic neck pain, numbness in both hands, discomfort and soft tissue mass in right shoulder.  On examination, he had decreased range of motion of the cervical spine, and could flex his lumbar spine only to 45 degrees. Straight leg raising test was positive on both sides.  He had equivocal Tinel's sign and Phalen's on both sides.  Sensation was grossly intact.  Dr. Vest opined that his chronic back and neck pain would cause difficulty in lifting, prolonged sitting, standing and walking.  He concluded that Mr. Gorsich "may be able to perform a sedentary type job" and recommended that he avoid lifting more than 10 to 15 pounds, avoid prolonged standing, walking, bending or stooping, and avoid repetitive use of the hands.  (Tr. 311).

**d)**     **Gateway Regional Medical Center, April 27, 2006, and March 31, 2007**

Plaintiff was seen in the emergency room on April 27, 2006, for an injury to the tip of his

left ring finger.  This happened when he lost his balance while working on a ladder in the garage.  (Tr. 355).

On March 31, 2007, plaintiff appeared in the emergency room complaining of pain in his right shoulder and neck, and a "knot" in his upper back.  He stated that he had a history of work-related injuries to his neck and back, and that he had been doing work around the house which had aggravated his prior injuries.  He was noted to be out of Tylenol #3 and Darvocet.  (Tr. 362-363).  The nurse's notes indicate that Mr. Gorsich asked for a copy of the chart and films to give to his attorney for "workman's comp."  (Tr. 367).  A CT scan of the right shoulder showed no abnormality.  (Tr. 371).  An x-ray of the right shoulder was negative.  (Tr. 372).  Plaintiff was given 2 Vicodin pills and discharged.  (Tr. 368).

### e)   Dr. McKee

Dr. McKee treated plaintiff for the crush injury to his finger on April 27, 2006.  He noted that the wound had been closed in the emergency room and was in "satisfactory shape."  Plaintiff had been given prescriptions for Keflex and Darvocet, but had no money and asked for a pain shot.  Dr. McKee gave him a Lidocaine shot.  (Tr. 346).

### f)   Dr. Ajao

Dr. Ajao of Southern Illinois Healthcare Foundation wrote a note on July 25, 2008, in which he stated that Mr. Gorsich "has an acute back injury and temporarily can not work at this time."  (Tr. 375).  There is no office note corresponding to that date.

On September 23, 2008, a MRI of plaintiff's lumbar spine was performed at Anderson Hospital on Dr. Ajao's order.  This test showed mild diffuse disc bulge at L4-5, and mild to moderate disc bulge at L5-S1. (Tr. 376).

On January 31, 2009, a MRI of plaintiff's cervical spine was performed at Anderson Hospital on Dr. Ajao's order.  This test showed degenerative disc disease with mild disc bulges at C5-6 and C6-7.  (Tr. 378).

**g)** **Psychological Evaluation - Dr. Cheryl Broneck**

Dr. Broneck is a clinical psychologist.  She performed an evaluation on June 29, 2005.

Her report is at Tr. 304-308.

Dr. Broneck conducted a clinical interview and administered several tests, including the

Minnesota Multiphasic Personality Inventory 2.  (Tr. 304).  She concluded that Mr. Gorsich's

thought processes were normal, but that he was "very fixated on his physical ailments."  (Tr.

305).  She assigned him the diagnostic codes of personality disorder NOS with cluster A

features, pain disorder, and major depressive disorder, moderate.  His GAF score was 51.  (Tr.

306).

Clinical impressions included this statement:

It was very apparent by the by the end of this assessment that Mr. Gorsich was primarily interested in pursing (sic) Social Security Disability rather than returning to work or being retrained.  In fact, the examiner questions his motivation throughout the assessment as his irritability, moodiness, and manipulations became apparent as the testing progressed.

(Tr. 306).

Dr. Broneck opined that plaintiff will be able to work in some capacity, although he will

not be able to do extensive manual labor.  She recommended that his physical complaints be

assessed by a physician, that he receive job training, and that his mood "be closely watched" in

that he had an elevated depressive scale and showed a number of symptoms consistent with a

diagnosis of depression.  She did not feel that he should be referred for psychotherapy, but

suggested he might benefit from "a medication intervention and a referral to a psychiatrist."  (Tr.

307).

**5.**    **State Agency Consultant Assessments**[2]

---

[2]"State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  **Social Security Ruling 96-6p, at 2.**

Dr. B. Rock Oh completed a Physical Residual Functional Capacity Assessment on July 15, 2005.  (Tr. 294-301).  He concluded that plaintiff was capable of performing medium work in that he could frequently lift 25 pounds, occasionally lift 50 pounds, stand or walk for 6 out of 8 hours, sit with normal breaks for 6 out of 8 hours, and had no push/pull limitations.   He noted no manipulative, postural, communicative or environmental limitations.

Dr. Oh indicated that he reviewed and considered medical reports from a number of sources, including Dr. Wilkinson, Dr. Chapa, Dr. McKee and Dr. Eavenson.  He noted Mr. Gorsich's history of back problems and lumbar surgery, but concluded that Mr. Gorsich should be fully capable of lifting 50 pounds occasionally and 25 pounds frequently.  (Tr. 301).

The assessment was reviewed and affirmed by a second state agency consulting physician on August 26, 2005.  (Tr. 312-313).

Kirk Boyenga completed a Mental Residual Functional Capacity Assessment form on September 9, 2005.  (Tr. 328-331).  He noted that plaintiff was not significantly limited in most areas of mental activities, but did note moderate limitation in the ability to maintain attention and concentration, ability to complete a workday and workweek without interruptions from psychologically based symptoms, ability to interact with the general public and ability to respond to changed in the workplace.  Based on his review of the file, he determined that plaintiff "experiences an affective disorder, a pain disorder and a personality disorder," but felt he is capable of performing simple tasks.  He further noted that plaintiff is able to perform "routine, repetitive tasks, as indicated by the ability to follow instructions and travel independently."  (Tr. 330).

**6.      Dr. Vest RFC Assessment**

Dr. Bruce Vest completed a one-page form on September 16, 2005, in which he stated that plaintiff can sit or stand for only 30 minutes at a time, can sit for a total of 4 hours a day and stand/walk for a total of 2 hours a day.  He stated that plaintiff would need a job that permitted

him to shift positions at will, and that pain interferes with attention and concentration "frequently."  He anticipated that Mr. Gorsich would miss work about twice a month due to his impairments.  (Tr. 332).

### Applicable Standards

To qualify for disability insurance benefits or for supplemental security income benefits, a claimant must be "disabled."   In this context, "disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See, *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and that he is not capable of performing his past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See, *Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether Mr. Gorsich is, in fact, disabled, but whether ALJ Eyerman's findings were supported by substantial evidence; and, of course, whether any errors of law were made. See, ***Books v. Chater***, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing** *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales***, **91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater***, **103 F.3d 1384, 1390 (7th Cir. 1997).**

## Analysis

Here, the ALJ properly followed the five step analysis. He concluded that plaintiff has severe impairments of degenerative disc disease of the cervical and lumbar spine, status post lumbar surgery, personality disorder not otherwise specified, pain disorder with both psychological factors and general medical condition, and major depressive disorder. He found that these impairments do not meet or equal a listed impairment. (Tr. 22-23) Plaintiff does not challenge the finding that his condition does not meet or equal a listed impairment.

The ALJ also found that plaintiff's testimony about the intensity, persistence, and limiting effects of his symptoms is not completely credible. (Tr. 25-28) Plaintiff challenges this credibility finding.

Dr. Vest's RFC assessment of September, 2005, was afforded "little weight" because of inconsistencies between his assessment and plaintiff's testimony, and inconsistencies with Dr.

-13-

Vest's assessment from two months earlier.  Further, the assessment did not articulate an objective medical basis for the extreme limitations.  (Tr. 27-28).

The ALJ accepted the mental RFC assessment by the state agency consultants on September 9, 2005.  (Tr. 27).

The ALJ determined that plaintiff has the RFC to lift 10 pounds frequently, occasionally lift 20 pounds, sit for 6 hours out of an 8 hour day, stand/walk for 6 hours out of an 8 hour day, but must be allowed to change position more frequently than every 2 hours.   The ALJ also found that he is moderately limited in his ability to carry out detailed instructions, and moderately limited in his ability to complete a workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods.  Lastly, he is moderately limited in his ability to respond to changes in the workplace.

Plaintiff was found to be unable to perform his relevant past work.  However, considering his age, education, work experience, and RFC, the ALJ found that there are jobs in significant numbers in the relevant economy which Mr. Gorsich can perform.

The ALJ accepted the VE's testimony and found that plaintiff was able to perform the jobs of cashier (2000 jobs), food and beverage order clerk (700 jobs), and unskilled security guard (3000 jobs).  (Tr. 29).  The ALJ noted that the VE's testimony is inconsistent with the DOT, but that the VE had adequately explained the discrepancy.  (Tr. 29-30).

**1.     Hypothetical Questions**

Plaintiff's first point is that the hypothetical questions posed to the VE did not include a limitation that the ALJ found as part of his determination of plaintiff's RFC, i.e., that plaintiff has moderate limitation in his ability to carry out detailed instructions.  The ALJ stated in the narrative portion of the decision that he accepted the mental RFC assessment completed by the state agency consultants.  (Tr. 27).  That RFC assessment stated Mr. Gorsich was not

significantly limited in his ability to understand and remember detailed instructions. (Tr. 328). However, at Tr. 24, the ALJ clearly stated that plaintiff "is moderately limited in his ability to carry out detailed instructions."

Plaintiff is correct in that the hypothetical questions posed to the VE excluded this limitation. The ALJ asked the VE to assume the opposite, i.e., "there's no evidence in (sic) limitations in the categories of the ability to carry out detailed instructions, or ability to accept instructions and respond appropriately to criticism." (Tr. 436).

Defendant suggests that this discrepancy should be regarded as a "mistake in drafting a decision," but does not explain wherein the mistake lies. Doc. 18, p. 14. This Court cannot justify disregarding the ALJ's explicit finding that Mr. Gorsich has moderate limitation in his ability to carry out detailed instructions.

Defendant also argues that the failure to include limitation in the hypothetical was harmless error.

Plaintiff bears the burden of showing that the error was harmful. ***Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009).** He attempts to do so by arguing that the jobs testified to by the VE require a reasoning level of 2 or 3 according to the *Dictionary of Occupational Titles*. However, plaintiff argues, jobs at all reasoning levels above level 1 require the ability to accept detailed instructions. **See,** ***Dictionary of Occupational Titles*, Appendix C–Components of the Definition Trailer, 1991 WL 688702.**

This Court cannot accept plaintiff's argument. The reasoning levels as described in the DOT are not as clear-cut as plaintiff would have it. Appendix C of the DOT specifies that jobs at reasoning level 2 require the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." Reasoning level 3 jobs require the worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or

diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations."

The DOT does not say that a person who is moderately limited in his ability to carry out detailed instructions could not perform the requirements of reasoning level 2 and 3 jobs. The Seventh Circuit has rejected a similar argument.  In ***Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)**, the Court held that a person who has the ability to follow simple instructions has the ability to perform a job at reasoning level 3.  Thus, this Court concludes that the failure to include the limitation in the hypothetical questions was harmless error.

**2.       Evaluation of Dr. Vest's Opinion**

Plaintiff argues that the ALJ erred in accepting the assessment of Dr. B. Rock Oh, who did not examine plaintiff, and rejecting the assessment of Dr. Bruce Vest, who did examine him. According to plaintiff, the ALJ rejected Dr. Vest's assessment without performing the analysis required by 20 C.F.R. 416.927(d).

On the contrary, the ALJ properly weighed Dr. Vest's opinion.  At Tr. 27-28, he explained that Dr. Vest's RFC assessment was given little weight because it conflicted with plaintiff's testimony that he is able to sit for 2 hours at a time and to stand for 2 hours at a time, and that he is able use his hands repetitively to mop, sweep, wash dishes and cook; the assessment is on a form which "includes a number of leading questions and similar inducements;" it does not articulate an objective basis for the extreme limitations assessed; and it is inconsistent with Dr. Vest's own report from two months earlier.

Plaintiff's attacks on the ALJ's weighing of Dr. Vest's opinion are unavailing.  Plaintiff testified that he can stand for a couple of hours and he can sit for an hour or so.  (Tr. 421). However, Dr. Vest said he could stand or sit for only 30 minutes at one time.  (Tr. 332).  The form does not provide any objective basis for these restrictions.  Plaintiff argues that the assessment was based on a physical examination.  The problem with that argument is that Dr.

Vest opined that plaintiff had milder restrictions in the first report that he wrote about his examination of plaintiff on July 13, 2005.  There is no evidence that Dr. Vest saw plaintiff again between the examination of July 13, 2005, and the completion of RFC form on September 16, 2005.  In his narrative report dated July 13, 2005, Dr. Vest opined that plaintiff's chronic back and neck pain would cause difficulty in lifting, prolonged sitting, standing and walking.  He concluded that Mr. Gorsich "may be able to perform a sedentary type job" and recommended that he avoid lifting more than 10 to 15 pounds, and avoid prolonged standing, walking, bending or stooping, and avoid repetitive use of the hands.  (Tr. 311).

Further, not only does Dr. Vest's RFC form conflict with his July, 2005, narrative report, it also conflicts with the report of Dr. Chapa, who examined plaintiff less than one month earlier, on June 30, 2005.  Dr. Chapa's examination was essentially normal.

For all these reasons, the ALJ's weighing of Dr. Vest's RFC assessment was supported by substantial evidence and was not erroneous.

**3.**      **RFC Findings Regarding Use of Hands**

The ALJ did not include any limitation in the use of plaintiff's hands in his RFC findings. Plaintiff argues that this was error because the record established that he had such limitations due to partial amputation of the left index finger, crush injury to right finger, bilateral carpal tunnel syndrome, and numbness in his hands.  **See, Doc. 16, p. 16**.

The medical evidence in the record does not support plaintiff's contention.  Mr. Gorsich lost the tip of his left index finger in 2001, which predates the relevant period.  (Tr. 239).  The injury to his ring finger was, according to the medical records, also on the left hand, and it occurred during the relevant period (Tr. 346).  However, there was no evidence that either of those injuries caused him any on-going problem or disability.  Further, plaintiff was never actually diagnosed with bilateral carpal tunnel syndrome.  Before the relevant period, in June, 2002, Dr. McKee ordered nerve conduction studies which showed mild carpal tunnel syndrome

on the *right*. (Tr. 234). However, plaintiff complained mostly of symptoms on the *left*. In January, 2003, Dr. McKee noted that plaintiff's complaints were not consistent with the results of testing. (Tr. 237). On June 30, 2005, Dr. Chapa reported that he had a negative Tinel's sign at both wrists, which suggests that he did not have carpal tunnel syndrome. (Tr. 292).

Plaintiff again focuses on Dr. Vest's report in arguing that he established a limitation in the ability to use his hands. In his July 13, 2005, report, Dr. Vest noted that plaintiff "complained of chronic numbness in both hands." (Tr. 310). Dr. Vest opined that plaintiff should "avoid repetitive use of the hands." (Tr. 311). Plaintiff argues that the ALJ erred in discounting Dr. Vest's opinion, and suggests that the VE's testimony supports his position. Plaintiff's argument in this regard misconstrues the VE's testimony.

The ALJ questioned the VE about repetitive use of the hands at Tr. 439-440. The VE testified that unskilled work requires, at least from time to time, repetitive use of the hands. The VE also explained that doctors sometimes "use the term repetitive when what really the proper vocational term would be constant." (Tr. 440). He testified that a person who is able to mop a floor is able to use his hands repetitively. Plaintiff clearly testified that he is able to mop a floor. (Tr. 426-427). Based on the medical evidence and the testimony of plaintiff and the VE, there was substantial support for the ALJ's conclusion that plaintiff did not have a limitation in the ability to use his hands, and was able to use his hands repetitively.

**4.**     **Assessment of Plaintiff's Credibility**

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** Social security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility

finding." ***Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein**.

Here, plaintiff has failed to demonstrate any error.  He first argues that the ALJ was mistaken in his statement that the record does not reflect that plaintiff was ever denied medical treatment due to inability to pay.  Plaintiff claims that he was denied pain medication on a visit to Dr. McKee.  However, the record actually reflects that, on the visit in question, plaintiff stated he had no money and asked the doctor to give him a pain shot.  The doctor complied with plaintiff's request by giving him a Lidocaine shot.  (Tr. 346).

Plaintiff next argues that the ALJ ignored the MRI report from January 27, 2003, which showed degenerative disc disease in the lumbar and cervical spine and degenerative changes in the shoulder.  See, Tr. 261.  Plaintiff argues that this report "directly supports" his complaints of pain.  He is mistaken.  The ALJ accepted that plaintiff has the degenerative changes that are reflected in the MRI report.  (Tr. 22).  The question is the extent of the symptoms caused by those degenerative changes.  The MRI report states only that degenerative changes are present, and does not purport to address the question of the nature or extent of symptoms which might result from those changes.

Lastly, plaintiff argues that the ALJ mischaracterizes his daily activities.  It is true that an ability to perform restricted household tasks does not necessarily contradict a claim of disabling pain. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)**.  However, the ALJ did not reject plaintiff's claims of pain based on restricted ability to do some household tasks.  Rather, the ALJ focused on plaintiff's testimony that he is unable to raise his arms above chest level without significant pain.  The ALF found that this specific claim was contradicted by the nature of the activities that plaintiff said he could do.  (Tr. 28).  The ALJ also found that this specific claim was contradicted by the fact that "in order to demonstrate the lump he described on his right arm, he removed his shirt by easily pulling it over his head."  (Tr. 28).

Plaintiff has not demonstrated any error with regard to the credibility findings.  As the

ALJ's credibility findings were not "patently wrong," they should not be overturned.  ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000).**

**5.      Evaluation of Dr. Broneck's Opinion**

Dr. Broneck conducted a psychological evaluation of on June 29, 2005.  Her report was discussed extensively by the ALJ  at Tr. 26-27.  Plaintiff argues that the ALJ's discussion of the report was selective, and that the ALJ gave "short shrift" to the diagnosis of somatoform disorder.

The Court first notes that Dr. Broneck did *not* diagnose plaintiff with somatoform disorder.  Plaintiff uses the terms pain disorder and somatoform disorder interchangeably, but they are not the same thing.  In somatoform disorder, "one has physical symptoms, but there is no physical cause."  ***Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006)**.  Plaintiff has never alleged that there is no physical cause for his pain; in fact, he has argued the opposite.

Dr. Broneck's diagnosis of pain disorder was based on the results of the MMPI-2 profile, which suggest that plaintiff's physical symptoms intensify in times of increased psychological stress, but he has little insight into this fact, and he tends to minimize psychological issues while emphasizing physical concerns.  (Tr. 306).  Thus, according to this diagnosis, plaintiff's pain has a physical origin, but is intensified by psychological stress.

In ***Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)**, the ALJ erred by finding that the presence of somatization implied that the plaintiff was exaggerating her pain.  Here, the ALJ did not commit such an error.  Rather, he accepted the diagnosis of pain disorder and explicitly stated that it had been factored into the determination of RFC.  (Tr. 27).

The fact that the ALJ accepted Dr. Broneck's opinion that plaintiff's pain has a psychological component does not mean that the ALJ was bound to accept plaintiff's testimony about the extent of his pain.  For the reasons explained in the preceding section, the ALJ's credibility findings were not erroneous.  The ALJ also noted that Dr. Broneck herself questioned

plaintiff's motivation and thought that he was primarily interested in getting Social Security benefits rather than returning to work or being retrained.  (Tr. 27).

Plaintiff also suggest that the ALJ erred in evaluating the severity of his depression.  The ALJ accepted that he has depression, but concluded that the record established that his mental impairments were not so severe as to be disabling.  Thus, he accepted the state agency consultant's mental RFC findings.  (Tr. 27).  Plaintiff has not pointed to any evidence that his depression is so severe as to be disabling, and, in this Court's view, the record contains no such evidence.

### Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of  law were made. Therefore, this Court recommends that Plaintiff's Motion for Summary Judgment (**Doc. 15**) be **DENIED**, and that the final decision of the Commissioner of Social Security, finding that plaintiff Joseph G. Gorsich is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **August 5, 2010.**

Submitted: July 19, 2010.              **s/ Clifford J. Proud**
                                       **CLIFFORD J. PROUD**
                                       **UNITED STATES MAGISTRATE JUDGE**